1               UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6

HOWARD L. BALDWIN AND KAREN BALDWIN, )

7                                      )

                    PLAINTIFFS,        )

8                                      )     CASE NO.

          vs.                          )     CV 15-6004-RGK

9                                      )

UNITED STATES OF AMERICA,              )

10                                     )

                    DEFENDANT.         )

11   _____)

12

13

14          REPORTER'S TRANSCRIPT OF COURT TRIAL

15            TUESDAY, NOVEMBER 22, 2016

16                    9:02 A.M.

17            LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24             *255 East Temple Street*
          *Los Angeles, California  90012*
25        *213.894.5949; macneilsandy@gmail.com*

      UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    APPEARANCES OF COUNSEL

 2

 3   FOR PLAINTIFFS, HOWARD L. BALDWIN AND KAREN BALDWIN:

 4        CHAMBERLIN & KEASTER, LLP
          BY:  ROBERT W. KEASTER, ATTORNEY AT LAW
 5        16000 VENTURA BOULEVARD, SUITE 700
          ENCINO, CALIFORNIA  91436-2758
 6        818.385.1256

 7        WILLIAMS COULSON JOHNSON LLOYD PARKER & TEDESCO, LLC
          BY:  STEVEN J. LYNCH, ATTORNEY AT LAW
 8        114 SOUTHPOINTE BOULEVARD, SUITE 200
          CANONSBURG, PENNSYLVANIA  15317
 9        412.422.7612

10
     FOR DEFENDANT, UNITED STATES OF AMERICA:
11
          OFFICE OF THE UNITED STATES ATTORNEY
12        BY:  GAVIN L. GREENE, ASSISTANT U.S. ATTORNEY
               CHARLES W. PARKER, ASSISTANT U.S. ATTORNEY
13        FEDERAL BUILDING, SUITE 7211
          300 NORTH LOS ANGELES STREET
14        LOS ANGELES, CALIFORNIA  90012
          213.894.4600
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                           I N D E X

 2

 3   PROCEEDINGS:                                          PAGE:

 4      Rulings on objections                                9

 5      Plaintiffs' opening statement                       12

 6      Defendant's opening statement                       20

 7      Plaintiffs' closing argument                        66

 8      Defendant's closing argument                        72

 9      Plaintiffs' rebuttal argument                       83

10

11   PLAINTIFFS' WITNESSES:                              PAGE

12   NICHOLAS RUTA
        DIRECT EXAMINATION BY MR. LYNCH                    24
13      CROSS-EXAMINATION BY MR. PARKER                    27
        REDIRECT EXAMINATION BY MR. LYNCH                  31
14
     HOWARD BALDWIN
15      DIRECT EXAMINATION BY MR. LYNCH                    35
        CROSS-EXAMINATION BY MR. GREENE                    42
16      REDIRECT EXAMINATION BY MR. LYNCH                  50

17

18   DEFENSE WITNESS:                                    PAGE

19   PHILLIP C. CONRAD
        CROSS-EXAMINATION BY MR. KEASTER                   55
20      REDIRECT EXAMINATION BY MR. GREENE                 64

21

22                        E X H I B I T S

23   (Exhibits received/marked into evidence at pages 12, 54, 58)

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 22, 2016

 2                               9:02 A.M.

 3                                 -oOo-

 4

 5         THE CLERK:  Calling calendar item No. 1, case

 6   No. Civil 15-6004-RGK, Howard L. Baldwin, et al. versus

 7   United States of America.

 8      Counsel, please state your appearances.

 9         MR. PARKER:  Charles Parker for the United States.

10         MR. GREENE:  Gavin Greene for the United States.

11         MR. LYNCH:  Steven Lynch for the Baldwins.

12         MR. KEASTER:  Robert Keaster for the plaintiffs.

13         THE COURT:  Okay.  Thank you.

14      Both sides ready to proceed?

15         MR. KEASTER:  Yes, Your Honor.

16         THE COURT:  This proceeding is a court trial.  I have

17   received, and correct me if I'm wrong, I believe it's a

18   stipulation that the declaration as to four witnesses can be

19   received without objection into evidence but subject to

20   cross-examination.

21      Is that correct?  Did I state that correctly?

22         MR. KEASTER:  Your Honor, there are certain objections

23   that have been made to certain portions of the declarations

24   that have been filed, so I think we probably need a ruling on

25   those objections.
```

5

```
1          THE COURT:  So what is -- what is your -- ordinarily,
2   as you know, we just start.  You call your witnesses and we
3   proceed.
4        What is your request of the Court as far as the
5   declarations?
6          MR. KEASTER:  The request, Your Honor, would be that
7   all of the testimony in the declarations that has not been
8   objected to is moved into evidence at the beginning of the
9   trial, and that any testimony that has been objected to, that
10  we obtain an evidentiary ruling from the Court so that we can
11  then proceed to call the witnesses to --
12         THE COURT:  But when exactly are you -- now, wait a
13  second.  Are you asking the Court to read all the declarations,
14  do this as kind of a motion in limine?  It wasn't presented as
15  a motion in limine.  Or are you saying we're going to present
16  them and then we'll make objections during the proceedings and
17  I can rule on them?
18         MR. KEASTER:  Well, I think, Your Honor, we need to
19  know whether or not you're going to sustain -- well, we had not
20  objected to the government's witnesses, Mr. Conrad's
21  declaration.
22          THE COURT:  Okay.
23          MR. KEASTER:  So there's no objection to his.
24          THE COURT:  Okay.  So that one comes in subject to
25  cross-examination.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. KEASTER:  Exactly.

 2              THE COURT:  Fine.

 3         As to the three other witnesses?

 4              MR. KEASTER:  As to the three other witnesses, there

 5    have been limited objections that have been made to certain of

 6    the statements in the declarations.

 7              THE COURT:  Okay.  Procedurally, it should have been

 8    done as a motion in limine, to be prepared before you get to

 9    trial as a motion in limine.  I have not ruled on those

10    objections because they haven't come in yet.  You know, at this

11    time they're not before the Court.  I'm assuming they're going

12    to be moved in in front of the Court, just like the declaration

13    of the defendant, subject to objection.  So we're going to have

14    to take a look at that.  You know, I would have hoped that

15    would have been done before today.  Today we're supposed to be

16    starting the trial.

17              MR. KEASTER:  The objections were filed, Your Honor.

18              THE COURT:  Counsel, they were filed, but there's

19    nothing to rule on them at this particular point in time.  They

20    were not done as a motion in limine.  That's what motions

21    in limine are all about, so you can decide legal issues before

22    trial, so when you start trial, these are decided before trial.

23    It was never made as a motion in limine.  We have one motion in

24    limine, and that was it.

25              MR. KEASTER:  Correct, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          THE COURT:  So I guess what you're telling me is,
2    okay, let's kind of hold this trial for a second, and we're
3    asking you at this time, the Court, to go in and make those
4    rulings, those evidentiary rulings, kind of a belated motion in
5    limine, we want you to make those rulings before we start the
6    trial.  Is that what you're asking the Court to do?  And if you
7    are, we could do that, but I'm just saying --
8          MR. KEASTER:  I think from an efficiency standpoint,
9    Your Honor, that's probably the prudent course of action.
10         THE COURT:  Okay.
11         MR. KEASTER:  Only because if the Court overrules the
12   majority of the objections that have been made, there's very
13   limited testimony that we need to offer in our case in chief
14   if --
15         THE COURT:  Okay.  We can do that, but it's going to
16   delay the trial as far as getting the trial started.  And we
17   can do that.  You know, we can take an hour or two break and I
18   can go through all that if that's what your request is.
19         MR. KEASTER:  I think it'll, at the end of the day,
20   speed up the trial, Your Honor.
21         THE COURT:  That's agreeable, Counsel?
22         MR. GREENE:  That's fine, Your Honor.  As an
23   alternative, as the Court has not reviewed the objections yet,
24   it may make more sense at this point to just proceed normally,
25   have the witnesses called and questions asked.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

8

```
 1              THE COURT:  I don't care.  Any way both sides want to
 2     do it.  Whatever is easiest for both sides.  You want to take
 3     an hour, go get coffee, whatever, I'll go through the
 4     objections and we'll proceed that way, or if you want to just
 5     go ahead with the witnesses.  I don't care, either way.  And if
 6     you want a couple of minutes to talk with each other and decide
 7     which way you want to do it, that's fine, too, but it's going
 8     to be your call.
 9              MR. KEASTER:  Our preference, Your Honor, would be to
10     take a break, let the Court review the objections, make
11     evidentiary rulings, and then, based upon those rulings, we
12     then know what questions we need to ask of the witnesses, and
13     it --
14              MR. GREENE:  That's fine, Your Honor.
15              THE COURT:  Okay.  We'll do that.  You know, I haven't
16     looked at it, but I'm assuming that will be easy enough to do
17     and I can come back in an hour.
18          And since it's your motion, Counsel, I guess you'll have
19     to buy him coffee during in the next hour.
20          We'll take about an hour.  We'll have you come back in at
21     10:00 o'clock, okay?
22              MR. KEASTER:  Thank you, Your Honor.
23              MR. GREENE:  Thank you, Your Honor.
24              THE CLERK:  All rise.
25          Court is in recess.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            (Recess held from 9:07 a.m. to 10:02 a.m.)

 2            THE COURT:  Okay.  In this particular matter, as to

 3    the three declarations, one's not contested.  One of the

 4    government's not contested, right, as --

 5            MR. KEASTER:  Correct, Your Honor.

 6            THE COURT:  -- as far as objections go?

 7        Let me give you the objections, the rulings on the

 8    objections, and then we'll proceed on these declarations that

 9    were submitted.

10        On the one of Howard Baldwin, there are going to be two

11    that objections will be sustained.  One is on page 3, paragraph

12    5, on the objections.  Where we're talking about Thomas Ruta

13    being a nationally respected CPA, that will be stricken.  The

14    second one is on page 4, where they refer to paragraph 8, where

15    he was talking about Nicholas Ruta coordinated the bookkeeping

16    and reviewing the financial information for accuracy, that will

17    be stricken, also, as no personal knowledge or foundation.

18    Everything else will be overruled.

19        On the Karen Baldwin, the objections will be overruled on

20    that one.

21        On the Nicholas Ruta, page 5, paragraph 8, that "Wuerfel

22    followed my instructions and mailed the package that day," that

23    will be stricken.  That's going to have to be testified to by

24    him.

25        On paragraph 9, page 6, "a leading investment firm by
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Howard Baldwin's brother," that will be stricken.  And not the

2    entire paragraph stricken, just those things I'm saying are

3    stricken.

4         Paragraph 9, halfway down the page, where it talks about

5    all invoices for payments were sent to the bookkeeper who

6    logged these bills and issued checks, the part that says "who

7    logged in these bills and issued checks to the vendors" will be

8    stricken.

9         On page 7, also paragraph 9, if you go down to the second

10   paragraph, that starts, "the system was put in place," the last

11   part of that sentence, "a highly respected New York City

12   accounting firm," will be stricken.

13        Page 8, paragraph 10, the statement that the accounting

14   information from the Quickbooks software was sent to, that's

15   going to be stricken because there's no foundation as to if

16   there's personal knowledge as to whether it was sent or not.

17   It may be a conclusion.  So there's no foundation on that, so

18   that will be stricken at this time.

19        The last sentence there on page 8, "Thomas Ruta is a

20   nationally recognized CPA," that will be stricken.

21        Page -- just a second.  Okay.  The next one is paragraph

22   37 on page 21.  On paragraph 37, that first paragraph, the

23   third sentence, the two words, "were properly" -- or excuse me,

24   the word "properly" will be stricken.

25        Also -- let's see, what else do we have on it.  Page 38,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   the last paragraph there, that starts out with the

2   $4,177,255.81, the word following that, four, five words later,

3   "properly," again will be stricken as conclusionary.

4        Forty-nine on page 29, the word "accurately" will be

5   stricken.  Again conclusionary.

6        All other objections will be overruled subject to the

7   evidence as it comes in, and goes towards weight or

8   cross-examination.

9        Okay.  So do we have the housekeeping done so we can

10  start?

11            MR. KEASTER:  We do, Your Honor.

12            THE COURT:  Okay.

13            MR. KEASTER:  I think you saved us several hours of

14  testimony doing that.

15            THE COURT:  Well, I don't know.  We'll find out.

16       There are two issues that I believe here are relevant to

17  the Court.  One is the issue of whether or not this was timely

18  filed or not.  Okay?  The second issue is whether or not

19  they're acceptable figures and offsets, et cetera.

20       Is that correct?

21            MR. KEASTER:  Correct, Your Honor.

22            THE COURT:  Okay.  I just want to make sure.  We're

23  looking at two different things that we're interested in here.

24       Okay.  The Court would accept those declarations as

25  modified.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              And do you want to proceed?

 2              MR. LYNCH:  Thank you.

 3              THE COURT:  And Counsel, this is a court trial, but if

 4    you'd like to make an opening statement first, that's fine.

 5    This is your opportunity to.

 6              MR. LYNCH:  Thank you.  I would like to make an

 7    opening statement.

 8              THE COURT:  Sure.

 9              MR. GREENE:  Your Honor, as a preliminary matter, I

10    would request that the Court move into evidence all of the

11    exhibits that we've stipulated to other than Exhibits 27

12    through 29.

13              MR. KEASTER:  No objection, Your Honor.

14              THE COURT:  Be received.

15         (Exhibits received in evidence as indicated.)

16              THE COURT:  Okay.  Go ahead, Counsel.  Opening

17    statement.

18              MR. LYNCH:  Thank you.

19         Good morning, Your Honor.  My name is Steven Lynch.  I

20    represent the plaintiffs, Howard and Karen Baldwin in this

21    matter, along with my co-counsel, Robert Keaster.  I've

22    represented the Baldwins for over 25 years, but I have to

23    confess, I don't stand up in court very often.  My mouth's a

24    little dry.

25              THE COURT:  That's okay.  It's not a court -- or it's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   not a jury trial.  It should be a little more relaxed.  Go
 2   ahead.
 3             MR. LYNCH:  Thank you.
 4             THE COURT:  And if you need water, let us know.
 5             MR. LYNCH:  As an introduction, Karen and Howard
 6   Baldwin are movie producers.  They operate a small production
 7   company that has done some very large projects.  For 25 years
 8   they've worked very hard to build up their company.  They
 9   produced many successful movies, including Mystery Alaska,
10   starring Russell Crowe, and the Academy Award-winning movie
11   Ray, starring Jamie Foxx.
12        In 2007, when the U.S. economy was going through a major
13   recession, small producers in the movie industry could not get
14   their projects financed.  The Baldwins' movie company, Baldwin
15   Entertainment Group, Ltd., suffered over $4 million of losses
16   in 2007, mostly attributable to movie projects that became
17   worthless in that year.  Approximately 2.5 million of these
18   losses were reflected on the Baldwins' 2007 Form 1040
19   Individual Income Tax Return, resulting in a net operating loss
20   of approximately $2.5 million.  This net operating loss was
21   carried back to the Baldwins' 2005 tax return by filing an
22   amended return on Form 1040X.  It is the claim for refund of
23   approximately $167,000 that resulted from this net operating
24   loss that is the subject of this litigation.
25        The administrative history of this case is important.
```

```
1          The Form 1040X was mailed on June 21, 2011, approximately
2   four months before the last date permitted by statute to file
3   the amended return.  The Form 1040X was the appropriate form
4   for filing a claim for refund for the 2005 tax year.
5          The IRS never challenged the amount of the net operating
6   loss claimed by the Baldwins on this Form 1040X.  Instead, the
7   IRS denied the claim for refund on the grounds that the amended
8   return was not timely filed, because the IRS purportedly could
9   find no record that they received the 2005 Form 1040X in 2011.
10         We will prove that the claim for refund was timely filed
11  by the Baldwins on June 21, 2011.  We believe that the IRS
12  timely received the Form 1040X in June of 2011 at their
13  Andover, Massachusetts, service center, and --
14             MR. PARKER:  Objection, argumentative.
15             THE COURT:  Overruled.
16         I'm going to give you little bit of leeway, being a court
17  trial.
18         Go ahead.
19             MR. LYNCH:  Thank you.
20         We believe that the IRS timely received the Form 1040X in
21  June of 2011 at their Andover, Massachusetts, service center,
22  and then forwarded it to the Kansas City service center for
23  processing, where the return was lost.
24         The government defense that the losses in this case were
25  not valid is not correct.  Recently, as part of this
```

1   litigation, the government has raised as a defense that they

2   did not believe that the deductions that gave rise to the net

3   operating loss carryback were valid deductions.

4        We will submit evidence that proves that the Baldwins,

5   through their movie company, had put in place a professionally

6   designed and accurate accounting process to track all cash

7   revenues and expenditures, that under this process, the cost to

8   produce certain movies were properly capitalized and the

9   deductions taken on the relevant tax returns were proper,

10  because these movie projects became worthless in 2007.

11       In addition, we will submit evidence that proves that

12  Howard Baldwin has sufficient tax basis in his S corporation

13  stock to allow him to take these deductions on the Baldwins'

14  Form 1040 for 2007, making the net operating loss that was

15  carried back to the 2005 tax year a valid deduction.

16       We have credible evidence that the Form 1040X was timely

17  filed.  The Nicholas Ruta declaration establishes that he

18  coordinated the preparation of the Form 1040X with the

19  Baldwins' accounting firm.  The Karen Baldwin declaration and

20  the Howard Baldwin declaration establish that Howard and Karen

21  Baldwin each signed the Form 1040X on June 21, 2011, after

22  receiving it from their accountants.

23       We will present evidence that meets our burden of proof

24  under the common law mailbox rule to show timely filing of the

25  Form 1040X.  The Howard Baldwin declaration establishes that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   the Baldwins gave Nicholas Ruta instructions to have the Form

2   1040X mailed on June 21, 2011.  The Nicholas Ruta declaration

3   proves that Nicholas Ruta instructed Ryan Wuerfel, another

4   employee of the Baldwin Entertainment Group, to place postage

5   on the pre-addressed mailing envelope, enclose the Form 1040X,

6   and mail the form at the Hartford Post Office on June 21, 2011.

7   The Ryan Wuerfel deposition proved that the 1040X was properly

8   mailed to the IRS service center in Andover, Massachusetts, by

9   Ryan Wuerfel, with adequate postage attached.

10       The undisputed evidence in this case will establish that

11  the IRS Form 1040X for 2005 was mailed on June 21, 2011, with

12  proper postage and addressed to the IRS service center in

13  Andover, Massachusetts, where the Baldwins paid their 2005

14  taxes, which were the subject of the claim for refund.

15       THE COURT:  Counsel, let me stop you just for a

16  second.  You mentioned the declaration of Wuerfel?

17       MR. LYNCH:  It's a deposition that's in evidence.

18       MR. KEASTER:  It's Exhibit 18, Your Honor.

19       THE COURT:  Okay.  But that's not one of the

20  declarations that you submitted earlier?

21       MR. KEASTER:  His deposition was taken.

22       THE COURT:  Deposition, that is correct, but I just

23  want to make sure.  You submitted four declarations, one for

24  the government, three from you, and so you're talking about a

25  deposition that is marked as evidence?

```
 1              MR. LYNCH:  Yes.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. KEASTER:  And has been admitted.

 4              THE COURT:  Go ahead.

 5              MR. LYNCH:  Thank you.

 6         The government has no evidence which is sufficient under

 7    the Ninth Circuit law to overcome the presumption of the

 8    receipt that results from the application of the common law

 9    mailbox rule.

10         We will submit evidence regarding the amount of the 2007

11    net operating loss.

12         The Nicholas Ruta declaration proves that the Baldwins had

13    in place a process with a professional bookkeeping service to

14    properly account for all cash receipts and cash disbursements

15    made by their movie company.  This process was established by a

16    reputable CPA firm to ensure that the Baldwins' tax returns are

17    accurately prepared.

18         The Nicholas Ruta declaration establishes that the

19    company's accounting processes were designed to ensure that all

20    bills were timely paid, that the cash receipts and cash

21    expenditures of the movie company were properly recorded in the

22    Quickbook files for the company on a contemporaneous basis to

23    assure their accuracy, and that the bank statements were timely

24    reconciled to ensure that the books and records were accurate.

25         The Nicholas Ruta declaration and the Howard Baldwin
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1 declaration establish that the movie projects were tracked in

2 the company's books and records on a project-by-project basis.

3      The Nicholas Ruta declaration establishes that the movie

4 company had capitalized costs in excess of $4 million with

5 respect to its movie projects, which were accurately reflected

6 in the company's trial balance, balance sheet, and tax returns.

7      The Nicholas Ruta declaration and the Howard Baldwin

8 declaration prove that the Baldwins only needed approximately

9 1.25 million of worthlessness deductions to permit the full

10 amount of the refund claimed on the Form 1040X.

11      We will present evidence to show that 2007 was the proper

12 year to take the loss deduction.

13      The Nicholas Ruta declaration, the Karen Baldwin

14 declaration and the Howard Baldwin declaration will prove that

15 2007 was the proper year to take the losses attributable to the

16 worthless movie projects.

17      Under seminal tax court case of *Echols vs. Commissioner*,

18 which is a Fifth Circuit 1991 case, the year that a worthless

19 intangible property loss is recognized for federal income tax

20 purposes is the year that objectively the asset has no

21 substantial value, and subjectively the taxpayer has made a

22 reasonable determination that the asset is worthless to the

23 taxpayer.

24      The Nicholas Ruta declaration, the Karen Baldwin

25 declaration and the Howard Baldwin declaration establish that

1    the legal rights to the movie projects in question had expired
2    in 2005, 2006 and 2007, making these rights have minimal value
3    in 2007 unless the Baldwins renegotiated these rights.
4         The Nicholas Ruta declaration, the Karen Baldwin
5    declaration and the Howard Baldwin declaration also establish
6    that the Baldwins determined that the movie company was no
7    longer going to pursue making these movies in 2007, thus
8    meeting the subjective test in *Echols* for taking a
9    worthlessness deduction.  Without further work, these
10   intangible property rights had no value after that.
11        We will submit evidence regarding the tax basis and Howard
12   Baldwin's S corporation stock.
13        The tax basis in this stock is calculated by adding the
14   cash contributions to the corporation made by Howard Baldwin to
15   the net income recorded in the tax returns of the company.
16   After that, you subtract from this amount the net distributions
17   made by the company to Howard Baldwin and the net losses
18   recorded in the tax returns of the company.
19        The Nicholas Ruta declarations and the Howard Baldwin
20   declaration establish that Howard Baldwin had approximately
21   2.5 million of tax basis in his S corporation stock, thus
22   permitting the deduction of the net operating loss that was
23   carried back to 2005.  The Nicholas Ruta declaration and the
24   Howard Baldwin declaration establish that Howard Baldwin only
25   needed approximately 1.25 million of tax basis in his stock to

1  permit the full amount of the refund claimed on the Form 1040X.

2   Therefore, since the 1040X refund claim for 2005 was

3  timely filed and sought to utilize a 2007 loss which was proper

4  and for which Howard Baldwin had sufficient basis in his

5  S corporation stock, plaintiffs are entitled to a judgment in

6  their favor in the amount of 167,663 -- excuse me, $167,663,

7  plus statutory interest.

8   Thank you.

9   THE COURT:  Thank you, Counsel.

10  You want to make an opening statement now, or do you want

11  to reserve it until you present your case?

12   MR. PARKER:  We'll make it now, Your Honor.

13   THE COURT:  Okay.

14   MR. PARKER:  Although plaintiffs allege that their

15  2005 claim for refund was mailed in June of 2011, evidence in

16  this case will show that the IRS records do not reveal that

17  they received that claim for refund in 2011.

18   What the IRS records do show is that the refund claim was

19  received in 2013, roughly two years after the statute had

20  expired.  What the IRS records will also show in this case is

21  that plaintiffs' 2007 income tax return, the income tax return

22  that reports the loss at issue, was filed over 700 days late.

23  The 2008 return, over 600 days late.  The 2009 return, over a

24  thousand days late.  And the 2010 return, over 600 days late.

25  And the claim for refund at issue in this case was filed 650

```
 1   days late.
 2        As for the mailing of the refund claim, you just heard
 3   that the plaintiffs have submitted the deposition testimony of
 4   Ryan Wuerfel.  He'll testify that he received some tax
 5   documents, a pre-addressed envelope, he put the documents into
 6   the envelope, put postage on it, and dropped it off at the post
 7   office.
 8        Significantly, Mr. Wuerfel's testimony will show that he
 9   did not personally review those documents before putting them
10   in the envelope, and then he did not know whether or not it was
11   the 2005 claim for refund.  His deposition testimony also shows
12   that he did not address the envelope.  The evidence will show
13   that he received that envelope from Nicholas Ruta.
14        Mr. Ruta was the former executive vice president of
15   Baldwin Entertainment Group, and his declaration shows that he
16   received that envelope and those documents from an outside
17   accounting agency.  However, Your Honor will not hear testimony
18   from anyone from that outside accounting agency, and
19   consequently, you will not hear testimony from the individual
20   who actually addressed the envelope.  Nonetheless, plaintiffs
21   contend that the envelope was sent and correctly addressed to
22   the service center in Andover, Massachusetts.
23        The government will present evidence regarding the IRS
24   instructions that accompanied all claims for refund filed in
25   2011.  Those instructions provide that residents of
```

1  Massachusetts were required to file the returns in Kansas City,

2  Missouri, not Andover, Massachusetts.

3      Secondly, the second issue, whether or not plaintiffs can

4  substantiate the loss, as you just heard, the loss was incurred

5  or written off on the 2007 corporate Baldwin Entertainment

6  return and then claimed on the 2005 -- or excuse me, 2007

7  individual return and carried back to the 2005 return.

8      And as you just heard, the plaintiffs will be required to

9  show that they incurred approximately $1.3 million in losses in

10  order to be entitled to the full $167,000 refund.  But during

11  this trial, plaintiffs will only present one source document

12  showing that those expenses were incurred.  That document is

13  the 2007 bank statements of Baldwin Entertainment.  And on

14  that, on those bank statements, Mr. Ruta has identified

15  approximately $127,000 in expenses that were claimed on the

16  2007 return.  So to prove the remaining 1.2 -- approximately

17  $1.2 million, plaintiffs will rely on the books and records of

18  Baldwin Entertainment, including the QuickBooks records.

19      The evidence will show that Baldwin Entertainment used an

20  outside accounting agency to maintain these books and records,

21  and it was this agency that entered the expenses into

22  QuickBooks.  However, the Court will not hear any testimony

23  from anyone at that agency.

24      When the testimony is concluded, the government will ask

25  the Court to find that, first, the Court lacks subject matter

```
 1   jurisdiction because plaintiffs have failed to show that they

 2   timely filed their 2005 claim for refund; and secondly, that

 3   plaintiffs have failed to present sufficient evidence to prove

 4   the $1.3-million loss necessary to be entitled to the full

 5   amount of the $167,000 refund.

 6           THE COURT:  Okay.  Thank you, Counsel.

 7       Okay.  Counsel, you want to call any witnesses?

 8           MR. LYNCH:  Thank you.

 9       Our first witness will be Nicholas Ruta.

10           THE COURT:  Okay.

11       This way, sir.

12           THE CLERK:  Right here to be sworn, please.

13       That's fine.  Can you please raise your right hand.

14       Do you solemnly swear the testimony that you are about to

15   give in the matter now before the Court shall be the truth, the

16   whole truth, and nothing but the truth, so help you God?

17           THE WITNESS:  I do.

18           THE CLERK:  Thank you.

19           THE WITNESS:  Thank you.

20           THE CLERK:  You may be seated.

21       And may I please ask that you state your full name for the

22   record and spell your last name.

23           THE WITNESS:  Yes.  Nicholas J. Ruta, R-u-t-a.

24           THE CLERK:  Thank you.

25           THE COURT:  Okay, Counsel, you may inquire.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              NICHOLAS RUTA, PLAINTIFFS' WITNESS,

 2                      DIRECT EXAMINATION

 3   BY MR. LYNCH:

 4   Q.   Mr. Ruta, would you tell us where you live today.

 5   A.   Yes.  In Pennsylvania.  Lawrence, Pennsylvania.  1414

 6   Yorktown Drive, in Lawrence, Pennsylvania.

 7   Q.   And how long have you worked for and with the Baldwins?

 8   A.   Oh, 25 years, I would suppose.

 9   Q.   And in that role, what is it that you did for the

10   Baldwins?

11   A.   Basically to coordinate business affairs, accounting,

12   banking functions for them.

13   Q.   Some of the things we're talking about are whether or not

14   the 2005 amended tax return was mailed by Ryan Wuerfel.  Would

15   you explain what happened the day that that return was mailed.

16   A.   Yes, I'd be happy to.

17        The returns were sent to our office in Hartford,

18   Connecticut, by Behan Ling & Ruta, and it was accompanied --

19   the returns had a green-and-white envelope, pre-addressed

20   mailing slips.  I received them at our office in Hartford.  I

21   reviewed them, just to make sure that everything was there, all

22   the proper information was there.  I walked into Howard and

23   Karen's office, asked them to sign the documents.  They looked

24   at them, they signed them, and I stepped immediately out to

25   Ryan Wuerfel's desk and asked him to follow the procedure that
```

```
 1    we would have followed continuously and asked him to -- to mail
 2    them immediately.
 3    Q.    There's some books up there, notebooks, that have the
 4    evidence in them.  Are they at your fingertips, Nick?
 5           THE COURT:  Behind you.
 6           THE WITNESS:  Oh, I see.
 7    BY MR. LYNCH:
 8    Q.    Would you get Volume 2 and take a look at Exhibit 35.
 9    A.    Yes.
10    Q.    It's the last exhibit in Volume 2.
11    A.    Yes.
12    Q.    Would you take just take a second, Mr. Ruta, and review
13    that document.
14    A.    Yes.  Let's see, June 6...
15           Yes, I've reviewed it.
16    Q.    Okay.  Would you explain what that document is.
17    A.    It was the document that accompanied the tax return, and
18    it's the cover page.  It's -- I'm very familiar with that cover
19    page.
20    Q.    So when you said a tax return, do you mean the 2005
21    amended tax return?
22    A.    Yes.
23    Q.    And that cover letter says there's a refund due in the
24    amount of $167,663?
25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And what is the address that that letter says to mail to?

2    A.   Internal Revenue Service, Andover, Mass, 05501.

3    Q.   And the green-and-white envelope that was given to Ryan

4    Wuerfel to mail, it had a pre-printed address on.  What was the

5    address that was on that envelope?

6    A.   That address.

7    Q.   So this letter matched -- did this letter match the

8    address on the envelope?

9    A.   Yes.

10   Q.   I'm done with that one, Nick.

11   A.   Okay.

12   Q.   Nick, did you coordinate the accounting process that we

13   use to prepare the Quickbooks files for Baldwin Entertainment

14   Group?

15   A.   Yes, I did.

16   Q.   Would you explain that process.

17   A.   We worked very, very closely on a daily basis with Baldwin

18   Brothers, and I worked with a particular individual there who

19   had -- I had worked with for many years, and I worked with her

20   on an ongoing basis in the cash in, cash out process for

21   Baldwin Brothers, Inc.

22   Q.   And did you help to put together the process for the

23   bookkeeping?

24   A.   I wouldn't say I -- I -- yes, I guess so, yes.

25   Q.   And did you supervise or oversee that process?

```
1    A.   Yes.

2    Q.   And was it done accurately?

3    A.   To my knowledge and to my expectation, it was.

4    Q.   Was there anything you ever saw that gave you any

5    indication that it wasn't done accurately?

6    A.   Not that I can recollect.

7    Q.   Did you hire professionals that you believed knew how to

8    do their job?

9    A.   Oh, absolutely.

10        MR. LYNCH:  I don't have any further questions for

11   you.

12        THE COURT:  Okay.  Cross-examination.
```

<strong>CROSS-EXAMINATION</strong>

```
14   BY MR. PARKER:

15   Q.   Mr. Ruta, you stated when you received the 2005 claim for

16   refund, it came with a pre-addressed envelope, correct?

17   A.   Yes, sir.

18   Q.   And then you gave that envelope with the tax documents to

19   Mr. Wuerfel?

20   A.   I gave them to Howard and Karen Baldwin, and they signed

21   them in my presence, and when I reviewed them and saw that they

22   had signed them properly, then I gave them to Ryan and

23   instructed him to mail them, as we would do in the normal

24   course of our business.

25   Q.   But you did not actually accompany him to the post office
```

1    to --

2    A.    No, I didn't, sir.

3    Q.    You just touched on it.  You were responsible for

4    overseeing the accounts payable; is that accurate?

5    A.    Not only the accounts payable, but any revenue received.

6    Q.    And you made reference to you were working with some woman

7    at Baldwin Brothers, Inc.; is that correct?

8    A.    Yes.  Specifically, her name was Rita.  Silva.  Rita

9    Silva.

10   Q.    All right.  So Ms. Silva, was she responsible for entering

11   into QuickBooks the expenses paid?

12   A.    Under my supervision, yes.

13   Q.    But you did not directly enter them into Quickbooks?

14   A.    I didn't do it directly, no.

15   Q.    So the losses that incurred in 2011, you had mentioned

16   that these were, in large part, due to capitalized losses; is

17   that correct?

18   A.    2011?

19   Q.    Excuse me.  2007.

20   A.    Please restate the question.

21   Q.    The losses that were written off on the corporate return

22   in 2007, what were those losses primarily?

23   A.    They were a representation of expired projects.

24   Q.    And where were those expired projects recorded, these

25   expenses?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    In the general ledger of the QuickBooks.

2    Q.    I would like to take a quick look at the general ledger.

3          Looking here at Exhibit 26, at page 9, we'll just take a

4    look at one of these projects, the Mandrake project.

5    A.    Yes, sir.

6    Q.    And there it says that $555,000 was written off in 2010 --

7    or excuse me, 2007, correct?

8    A.    Yes.

9    Q.    But the expenses, much of the expenses here were incurred

10   in years prior to 2007, correct?

11   A.    I can't say that "much" of them.  I can say that that's a

12   representation of what was written off --

13   Q.    Okay.

14   A.    -- but expired.

15   Q.    Okay, we'll get back to that.  But this $555,000, that was

16   not a -- one lump-sum payment?

17   A.    No, it wasn't.

18   Q.    And your declaration makes reference to the Comerica Bank

19   account held by Baldwin Entertainment --

20   A.    Yes.

21   Q.    -- correct?

22         And this account was used to pay expenses on behalf of

23   Baldwin Entertainment?

24   A.    Yes.

25   Q.    And you address two specific projects in your declaration.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   First one we just took at look at was Mandrake, correct?
 2   A.   Yes.
 3   Q.   And your declaration states that in 2007 there's a payment
 4   from the Comerica Bank account of $50,000 that's attributable
 5   to capitalized option costs of that project; is that correct?
 6   A.   I can't -- I believe that's accurate.
 7   Q.   Take a look at Exhibit 26, page 60.  Again we'll look at
 8   the Mandrake project here in the middle of the page, and here
 9   it says that the balance coming into 2007 was $278,000,
10   correct?
11   A.   Yes.
12   Q.   And then the expenses incurred in 2007 were one $50,000
13   payment, correct?
14   A.   Yes.
15   Q.   And that payment was to King Features Syndicate?
16   A.   Yes.  That was -- yes, it was, to King Features, to extend
17   the option.
18   Q.   And now looking at Exhibit 25, page 35, which is the
19   Comerica Bank statement, and we locate that $50,000 payment.
20   A.   Yes.
21   Q.   Check 11567.
22        Looking at the Comerica Bank statement, you can't actually
23   tell who that payment was made to, correct?
24   A.   If I can see the entire form.  I can't see the right
25   column.  But on that basis, it didn't -- it just tells the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   check number, but it doesn't say who it's made out to.

 2   Q.   So in your declaration, when you say that the payment was

 3   made -- excuse me, when the payment was made to King Features

 4   Syndicate, you're relying on the general ledger?

 5   A.   The general ledger and my memories.

 6            MR. PARKER:  No further questions, Your Honor.

 7            THE COURT:  Okay.  Any redirect?

 8            MR. LYNCH:  Yes, Your Honor.

 9                        REDIRECT EXAMINATION

10   BY MR. LYNCH:

11   Q.   Mr. Ruta, I want to stay on that same Comerica Bank

12   statement.  Could you open up your book to Exhibit 25?  And

13   it's --

14   A.   Two or --

15   Q.   Volume 2, yes.

16            THE COURT:  Volume 2, the one you were --

17   BY MR. LYNCH:

18   Q.   Exhibit 25, and it's page 35 on that.

19   A.   Yes.

20   Q.   Okay.  And would you look at that bank statement.

21   There's, obviously, a fair number of checks that were written.

22   What's the largest one that's written that month?

23   A.   24,966.

24   Q.   Try going down on the left-hand column.

25            THE COURT:  I'm sorry, you talking about Exhibit 25?
```

```
1              MR. LYNCH:  Page 35.

2              THE COURT:  Page 35.  Okay.

3              THE WITNESS:  Yes, I'm looking.

4  BY MR. LYNCH:

5  Q.   Yeah.  Do you see check No. 11567?

6  A.   No, I don't.

7              THE COURT:  I think you may be on the wrong page.

8  What exhibit are you on?

9              THE WITNESS:  Page 35.

10             THE COURT:  What exhibit?

11             THE WITNESS:  Exhibit 26.

12             THE COURT:  No, 25.

13             MR. LYNCH:  25.

14             THE WITNESS:  Oh, I'm sorry.

15        Yes.  This is Exhibit 25, on page 35, yes.

16 BY MR. LYNCH:

17 Q.   Yes.  And could you tell me what was the largest check

18 that was written that month?

19 A.   Let's see here.  $20,000.

20 Q.   Would you look in the left-hand column, look at check

21 No. 11567.

22 A.   Yes.

23 Q.   This the one you were asked about on direct -- or on

24 cross-examination.

25 A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   How much was that one?

2    A.   50,000.

3    Q.   Is that the largest one on there?

4    A.   Yes.

5    Q.   And is that -- during that period of time, was that a

6    large check for Baldwin Entertainment to write?

7    A.   Yes.

8    Q.   I'm going ask you to go back to Exhibit 26, page 60.

9    A.   Yes.

10   Q.   Okay.  And if you look down there under the Mandrake

11   project, there's payment of $50,000 from the Comerica check.

12   A.   Yes.

13   Q.   Is that the same 50,000?

14   A.   I believe so, yes.

15   Q.   And then could you turn to page 33 of Exhibit 26.

16   A.   Yes, I'm on that page.

17   Q.   Okay.  And if you look, it's approximately about an inch

18   up from the bottom, and it says King Feature Syndicate.

19   A.   Yes.

20   Q.   $50,000.

21   A.   Yes.

22   Q.   Is that the other side of that entry in the QuickBooks,

23   the cash side of the ledger?

24   A.   Yes.

25             MR. LYNCH:  Okay.  I don't have any other questions.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Thank you.

 2              THE COURT:  Okay.  Redirect.  Or recross, I'm sorry.

 3              MR. PARKER:  Nothing, Your Honor.

 4              THE COURT:  Okay.  You may step down.

 5              THE WITNESS:  Thank you.

 6              MR. LYNCH:  Thank you, Nick.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Thank you.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Next witness.

11              MR. LYNCH:  For our next witness, we'd like to call

12    Howard Baldwin.

13              THE COURT:  Okay.

14              THE CLERK:  Please raise your right hand.

15         Do you solemnly swear the testimony that you are about to

16    give in the matter now before the Court shall be the truth, the

17    whole truth, and nothing but the truth, so help you God?

18              THE WITNESS:  Yes, I do.

19              THE CLERK:  Thank you.  You may be seated.

20         May I please ask that you state your full name for the

21    record and spell your last name.

22              THE WITNESS:  Howard Baldwin, B-a-l-d-w-i-n.

23              THE CLERK:  Thank you.

24              THE WITNESS:  You're welcome.

25              THE COURT:  Okay.  You may inquire, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           **HOWARD BALDWIN, PLAINTIFF HEREIN,**

2              **DIRECT EXAMINATION**

3 BY MR. LYNCH:

4 Q.    Good morning, Howard.

5     Could you please tell the Court where you live now.

6 A.    We live in Studio City, California.

7       THE COURT:  And Counsel, I know you're not familiar

8 with the courtroom as much as you might like to be, but we

9 really should always, for the record, address everybody by last

10 name.

11       MR. LYNCH:  Okay.

12 Q.    Mr. Baldwin, would you please tell the Court your current

13 occupation.

14 A.    Film producer.

15 Q.    And if you could, Mr. Baldwin, could you please tell the

16 Court how you became a film producer, starting with your first

17 job.

18 A.    Be happy to.

19     At the time I became a film producer, I was in the hockey

20 business, believe it or not, in Hartford, Connecticut.

21 Minority owner, managing general partner of the Hartford

22 Whalers.

23     Had a good friend who was out here working in product

24 placement for MGM, and like so many other people out here, he

25 had a movie script he needed a little financing for, and he

```
 1   said, "We're going to do well with this.  Would you help me
 2   out?"  And I did.  And the movie got made, Flight of the
 3   Navigator.
 4   Q.    And you were talking that you were at that time the
 5   managing general partner of the Whalers, a National Hockey
 6   League team.
 7   A.    That's correct, yes.
 8   Q.    And did you have any other involvement with the National
 9   Hockey League?
10   A.    At that time, other than being I'm the member of the Board
11   of Governors of the National Hockey League as a representative
12   for the Whalers, which I always was as long as we owned the
13   team, I had no other involvement.  I started the team in 1971.
14   Q.    And after you were no longer involved with the Whalers,
15   did you become involved with any other National Hockey League
16   teams?
17         THE COURT:  Counsel, let me interrupt you, because I'm
18   not too sure the relevancy of the background, whether or not it
19   goes to the issues that the Court's supposed to be deciding
20   today.
21         MR. LYNCH:  Okay.
22         THE COURT:  So you may want to slide through that a
23   little quicker.
24         MR. LYNCH:  I will.  Okay.
25   Q.    Mr. Baldwin, could you tell us a little, tell the Court a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   little bit about the work you've done in the movie industry.

2   A.   Yes.

3       We are what's known as independent film producers, and my

4   wife Karen and I love getting projects, getting the rights to

5   projects, developing -- excuse me, developing them, attaching

6   enough creative elements that will hopefully attract the proper

7   financing.  And over the years we've made a number of movies,

8   some very good and successful, and some, like any other movie

9   producer, you'd just soon forget about.  But that's what a

10  producer does, and that's what we do now and have done for the

11  last 25 years, I reckon.

12  Q.   Can you give us an example of a good one and then a bad

13  one.

14  A.   Well, certainly *Ray* was a good one, because it met all the

15  critical acclaim that you could hopefully and possibly ever get

16  from a movie.  We were then partnered with Phil Anschutz of --

17  I think some people know Phil, but I mean, we were partnered

18  with Phil Anschutz and funded the movie, and the movie did

19  extremely well financially and did extremely well critically.

20      Gosh, I'd like to sit up here and say we didn't make any

21  bad ones, but we made some that I'd just as soon turn the page

22  on.  One movie called *The Patriot.*  I tell everybody it wasn't

23  the good *Patriot,* it was the one that was not so good, which

24  was a Steven Seagal picture that we made up in Montana and

25  didn't do so great.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    But your example of a good one, Ray, did it win any
 2   Academy Awards?
 3   A.    Two.   Jamie Foxx won one, and music editing.
 4              THE COURT:   Counsel, let me cut you off, because
 5   although it may be fascinating, it has nothing to do with this
 6   case.
 7              MR. LYNCH:   Okay.   I'll move on.
 8              THE COURT:   Okay.
 9              MR. LYNCH:   I -- okay.
10   Q.    As a producer, when you try to put together a movie
11   project, are all of them successful?
12   A.    Not at all.   Your -- your ratio of projects that you may
13   take under development to actual production in some cases can
14   be 1 to 30, 1 to 40.   We had a pretty good ratio, but believe
15   me, we had a number in development that didn't work out.
16   Q.    And when you're developing these projects, do you have to
17   incur costs in order to move these projects along?
18   A.    Yes, sir.   You -- you -- obviously, you have to acquire
19   the rights, and that can come in a couple of different forms.
20   One, it can be a book, a comic strip.   It can be a story of
21   anybody in here.   And you acquire the rights.   It's always done
22   with an option.   And then you have to go about getting a
23   screenwriter to develop a proper screenplay.   And usually very
24   rare when one screenplay does the trick.   It's usually a long
25   process.   Ray took 13 years.   Some can go quicker, some longer.
```

1   Q.   And so at some point in the process, you have to make a

2   decision whether you're going to continue on that project?

3   A.   Yes.

4   Q.   And when you determined that a project wasn't worth

5   continuing to work on, what were the factors that would come

6   into play?

7   A.   Well, there are a few factors.  One is, you could just be

8   financially at a point where you can no longer afford to keep

9   it, which happened to us, but it also can be the project just

10  isn't gaining traction, and you gotta look yourself in the

11  mirror and say, okay, this isn't working, we've gotta have time

12  spent on something that is more viable and that might work.

13  Q.   In 2007, did you have financial difficulties with your

14  film company?

15  A.   Yes, we did.  The industry changed.  The notion of

16  financing an independent movie the way we had done it in the

17  past -- and we've done studio pictures, but the independent

18  financial world changed because lending dropped.  Foreign

19  sales -- certain foreign sales companies weren't able to come

20  up with the same values they were previously, and we just -- we

21  just weren't able to sustain the company at that point in time.

22  Q.   In your declaration, you had some information about the

23  Mandrake project.  Would you explain the Mandrake project.

24  A.   Mandrake project is based on a comic strip I believe

25  started in about 1930, owned by King Features.  And, you know,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    everybody at the time -- everybody still does -- look for those

2    superhero movies.  This was a superhero that did magic.  And we

3    were very excited about it and were able to make a deal to

4    acquire the rights, and we put a lot of money, as everybody has

5    seen, into that one.

6    Q.   And when you invested the money in that project, did you

7    expect to someday make a movie with it?

8    A.   Oh, yes.  Every time you take on a project and put money

9    into it, you think it's going to be the next great Academy

10   Award-winning film that will do a billion dollars.  And then

11   reality sets in.

12   Q.   And with the Mandrake project, you talked about having the

13   rights to that project.  Where did you get those rights?

14   A.   From King Features.

15   Q.   And did King Features give you those rights forever?

16   A.   No.  No, no.  We would -- we would pay a check for an

17   option, and hopefully the -- I don't remember what the length

18   of the option was, but usually a year and a half.  And

19   sometimes there's renewable clauses in there, sometimes there

20   are performances clauses in there, but they always own the

21   inherent rights.  And then if you exercise the rights to buy

22   it, actually buy it, it means you're getting your movie made.

23   Q.   And if those rights expired, what's the value of work that

24   you did on that project?

25   A.   No value.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And in 2007, when the company was having financial
 2   difficulty, was that the reason that you stopped the Mandrake
 3   project?
 4   A.   Yes.
 5   Q.   And did the rights to the Mandrake project expire because
 6   you stopped renewing them?
 7   A.   We were at -- pardon the expression, but we were just out
 8   of gas, and the rights had expired, and King Features was
 9   getting impatient and wanted to move on.
10   Q.   Sometimes when the rights technically expire, you continue
11   to negotiate with the person who owns them?
12   A.   Oh, yes.  You can do that, and sometimes, if the
13   relationship is good, and our relationships are, you know, I
14   think almost in all cases very good, you know, they may give
15   you what they call a courtesy window to keep going, but if they
16   can then find another buyer, your courtesy window is gone
17   and -- but we knew we were -- we were burned out and done at
18   that point in time.  That was a tough time, sir.
19   Q.   And when you -- in 2007, when, as you said, you ran out of
20   gas, did you leave the movie business?
21   A.   A good way to put it is, we -- we took a sabbatical from
22   it.  We headed back East and kind of put our old hockey hats
23   on.  Thanks to Karen, we kept some of them alive to the best of
24   our ability, but we took a good break from it.
25             MR. LYNCH:  I don't have any further questions.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

42

```
 1              THE COURT:  Okay.  Cross.
 2                    CROSS-EXAMINATION
 3   BY MR. GREENE:
 4   Q.   Good morning, Mr. Baldwin.
 5   A.   Good morning.
 6   Q.   You said you've been producing movies for the last 25
 7   years?
 8   A.   Since about 1988, whatever that is.  Maybe that's a little
 9   longer than.
10   Q.   And from 2003 through 2007, you were the president of
11   Baldwin Entertainment Group, correct?
12   A.   Correct.
13   Q.   And during that time, how many options were purchased by
14   Baldwin Entertainment Group?
15   A.   Oh, I couldn't give you an exact number, but there --
16   maybe seven, eight.
17   Q.   Between 2003 and 2007, Baldwin Entertainment Group only
18   purchased seven or eight options?
19   A.   Well, we still owned some when we had the company, but we
20   had -- we had about -- you asked me how many we might have
21   purchased between 2003, 2008.  There were others that we had
22   over the years that we continued to try to work on, but I don't
23   remember the exact number.
24   Q.   And by "purchased," you mean purchased the rights so that
25   you could make the movie?
```

1   A.    Option the rights, not purchase.  Option the rights.

2   Q.    So is that to say that between 2003 and 2007, you only

3   had, say, less than ten options at Baldwin Entertainment Group?

4   A.    I couldn't recall the exact number.

5   Q.    What's your best estimate?

6   A.    It'd be inappropriate for me to give an estimate, because

7   there were times when some people would come in, knowing that

8   we had a pretty good track record, and would say, "Would you

9   work with us on this?" and we would -- if we like the project

10  and Karen and I liked the project, we would work with them.

11  But the fundamental ones that we had the most energy and

12  dollars into are clearly stated in the financial records:

13  Mandrake, Phantom.  Atlas Shrugged was another one.  De Miracle

14  was one.  And those are the ones that we had the heavy

15  investment in that we worked the hardest on.

16  Q.    If you would please turn to Exhibit 26, page 9.

17          THE COURT:  That's in Volume 2.

18          THE WITNESS:  Yes.

19  BY MR. GREENE:

20  Q.    Please tell me, what is listed on this page?

21  A.    There is an extensive list of projects.

22  Q.    And these are the projects that were held by Baldwin

23  Entertainment Group?

24  A.    We -- that were either held by us or that we had money in

25  and that we were working on.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   So it's possible that you would put money into projects

2   that you didn't have an option for?

3   A.   We might have.

4   Q.   And approximately how many different projects did you have

5   in 2007?

6   A.   As I testified before, somewhere that -- you know, there

7   was a number that we had that we had actual rights to.  It

8   would be somewhere around ten.  It could be 12.  But the

9   important ones were the ones I articulated to you a few minutes

10  ago.

11  Q.   But this list is many more than ten or 12.

12  A.   Oh, yeah, but some of this list has, like, a general

13  expense on where we might have a cup of coffee with a writer

14  and talk to him, for example, about Uncle Percy, $14.68, and

15  with the hopes of maybe we connect on doing a deal.  But we

16  were very, very efficient and very, very thorough, when we had

17  a cup of coffee with a writer, to attribute it to the right

18  project.

19          THE COURT:  Let me ask a question.  These projects,

20  these are projects that had expired as of December 31, 2007; is

21  that correct?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  And the last column indicates when

24  they expired; is that correct?

25          THE WITNESS:  Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Go ahead, Counsel.
 2   BY MR. GREENE:
 3   Q.   So for the projects that expired before 2007, does that
 4   mean that the option expired before 2007?
 5   A.   Yes, I would assume that's correct.
 6   Q.   For the Mandrake project, the capitalized film expense was
 7   $555,807, correct?
 8   A.   I believe that's correct.
 9   Q.   Well, if you look close to the bottom, under Mandrake on
10   Exhibit 26, page 9, that's what that reflects, correct?
11   A.   Yes, it does.
12   Q.   And that consisted of multiple payments, correct?
13   A.   Yes.
14   Q.   And those payments were made over multiple years?
15   A.   Yes.
16   Q.   Approximately how many checks were issued to comprise that
17   total?
18   A.   I wouldn't be able to give you a good answer to that, but,
19   you know, there were -- as previously testified by Mr. Ruta,
20   you know, a $50,000 check is a pretty big check.  The other big
21   checks would have been to the writers and the guild.
22   Q.   So you don't remember exactly who the checks were made out
23   to for the Mandrake project?
24   A.   Well, that's not quite right.  The actual rights were --
25   would have all been made to King Features.  And then we had a
```

46

```
 1    series of writers on Mandrake.  It started with a writer who is
 2    an expensive writer, Jim Hart, who we've done other work with,
 3    who has done some wonderful movies, and then, you know, you go
 4    so far with a writer, and if you're not getting there, you
 5    might put another writer on.  But for a writer, you know, the
 6    guild minimum today -- I forget what it was then.  The guild
 7    minimum today is almost $100,000.  So you get up there pretty
 8    quick.
 9    Q.   But in this case, you don't remember all of the payments
10    that comprised the total for the Mandrake project?
11    A.   No, I don't.
12    Q.   When your company issued a check for a specific project --
13    or when your company issued a specific check, was the amount of
14    that check allocated across projects in any case?
15    A.   Well, no.  If you had a check attributed to Mandrake or
16    King Features, it was designated -- we actually had two
17    projects with King Features, but if it was a check for King
18    Features and a check for Jim Hart, who was writing the script
19    on Mandrake, it would have been attributed to the project.  If
20    we had a cup of coffee with a writer, or a lunch, and we picked
21    up the tab, which unfortunately we had to do a lot, you
22    attribute that lunch to the project.
23    Q.   So there was never any allocation between multiple
24    projects?  Each payment went to a specific project?
25    A.   That is correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    For the Phantom project, it indicates that it expired in

2    2006; is that correct?

3    A.    Yes.  Excuse me.  Yes.

4    Q.    And when the option expires, you have no right to make the

5    movie; is that correct?

6    A.    You have no right to make the movie unless you go back and

7    renew the option.  Or for whatever reason the company you've

8    been dealing with falls in love with you and they're going to

9    let you have it for free.  And that hasn't happened to us yet.

10   Q.    But when the option expires, you have no right to make the

11   movie?

12   A.    That is correct.

13   Q.    And the project is worthless unless you get a new option

14   to make the movie?

15   A.    That is correct.

16   Q.    The De Miracle project had capitalized film expenses of

17   almost $400,000, correct?

18   A.    Just looking to make sure I don't -- yes, that's correct.

19   Q.    And as with Mandrake, that total represents multiple

20   payments over multiple years; is that correct?

21   A.    That's correct.

22   Q.    And you can't remember at this point exactly who each of

23   those payments went to; is that correct?

24   A.    Well, on De Miracle, I can tell you that most of the

25   payments would have gone to the writers.  That -- that was not

```
 1   something from King Features or something.  That was an idea
 2   that a writer bought and developed with us.
 3   Q.   And can you remember specific checks to specific writers
 4   in specific amounts?
 5   A.   No, I can't.
 6   Q.   The project Indiscretion had --
 7   A.   76 thousand --
 8   Q.   76,000?
 9   A.   -- 519 dollars and 2 cents.  92 cents.  Forgive me.
10   Q.   And then your declaration, originally that project expired
11   in 2006, correct?
12   A.   Correct.
13   Q.   And how much money was paid in 2007 to get a second option
14   on that project?
15   A.   The actual amount for the second option?  I don't recall.
16   Q.   Similarly, Shadow Ball also expired in 2006, correct?
17   A.   That's correct.
18   Q.   Were you familiar with the accounting system in place in
19   your company?
20   A.   I'm familiar with it, yes, but, you know, if I may, the
21   standard operating procedure for me and for Karen was Nick
22   Ruta, and Nick being the link to my brother's office, Baldwin
23   Brothers, and to Tom Ruta's office, and we worked that way for
24   a very long time, in film and in hockey.
25   Q.   So you trusted others and didn't get involved yourself
```

```
 1   with the accounting?

 2   A.    I trusted others.

 3   Q.    And you weren't involved yourself in the accounting?

 4   A.    I knew everything that was going on.  I was very aware,

 5   but when it gets down to did this -- a $75 check or whatever, I

 6   mean, Nick and I and Karen worked together a long time.

 7   Q.    And so you trusted others to take care of the accounting?

 8   A.    That's correct, yes.

 9   Q.    And you didn't supervise any of the inputting of the

10   information into QuickBooks, correct?

11   A.    That would be absolutely correct.

12   Q.    And you never reviewed the QuickBooks material; is that

13   correct?

14   A.    At the end of each year, we'd always review what we were

15   going to, you know, write off, what was a project that we

16   couldn't go forward with, and we'd have a good business

17   discussion.  But beyond that, I didn't hover over them.  I did

18   not.

19   Q.    And you didn't review the information entered into

20   Quickbooks for accuracy, correct?

21   A.    No.  I mean that's correct.

22   Q.    With respect to the 2005 Form 1040X, did you review the

23   envelope before it was mailed out?

24   A.    As previously stated, Mr. Ruta, Nick, came into our

25   office -- Karen and I shared an office, as we do today -- and
```

50

1    said, "Here, would you sign this.  Good news, you're getting

2    money back for once."  And so we signed it, and he took it and

3    then proceeded to give it to Ryan Wuerfel, who was on the desk

4    right in front of me.  Ryan is a wonderful young man.  His

5    step-father, I've known for life.  And he did what he was meant

6    to do with it, as he said.

7    Q.   But you didn't review the envelope for the 2005 1040X?

8    A.   Well, I didn't review the envelope, but I remember those

9    envelopes.  They're a nice white envelope with green little

10   edges, and I always liked them because they were the color of

11   the hockey team.  But I didn't actually review beyond that.

12   Q.   So you remember the color but not the address on the

13   envelope.

14   A.   Yeah, I didn't look at the address.  But I was pretty

15   sure, because we never, ever in the past had not sent it

16   properly, so I was sure that it was accurate and going to go

17   where it was meant to go.

18        MR. GREENE:  Nothing further, Your Honor.

19        THE COURT:  Redirect.

20        MR. LYNCH:  Thank you.

21                      **REDIRECT EXAMINATION**

22   BY MR. LYNCH:

23   Q.   Mr. Baldwin, I'd like to come back to a couple things that

24   were asked on cross-examination and had to do with the years

25   that rights expired.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          The Mandrake project, if you would take a look at -- I'm

 2   going to send you to Exhibit 26, page 9.

 3   A.   Yes.  Yes.

 4   Q.   It's about an inch and a half up from the bottom.  It's

 5   $555,870.82.

 6   A.   Yes.

 7   Q.   And right next to it, it has the year that that project

 8   rights expired?

 9   A.   Yes.

10   Q.   What year is that?

11   A.   2007.

12   Q.   And would you take a look at the next page, which would be

13   page 10.

14   A.   Yes.

15   Q.   At the very bottom, it has "options," and the Phantom

16   project, the option expired in 2006.

17   A.   Yes.

18   Q.   Okay.  But that project, was it still alive in 2007 for

19   you?

20   A.   I'm going to give you the best of my recollection on that.

21   No, I don't believe it was.  We had -- we had bought both from

22   King Features, optioned both from King Features, and The

23   Phantom proved to be more of a struggle and got more on the

24   back burner and our focus was on Mandrake.  So I believe in

25   2006 everything was off.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   The write-off was taken in 2007 because at that point in
2    time you determined it wasn't a project that you were going to
3    carry forward?
4    A.   Right.
5    Q.   As I understand your process, you would sit down at the
6    end of each year and discuss with Tom Ruta, your accountant,
7    projects that you were no longer working on; is that correct?
8    A.   That is correct.  Tom and Nick.
9    Q.   Tom and Nick?
10   A.   Yeah.
11   Q.   In 2006, when you had that discussion, did you decide to
12   write off that project, the Phantom project?
13   A.   I don't recall, but I believe so, but it would have been
14   2006.  Yeah, I believe so.  I mean, it was -- we were --
15   whether they officially did or not, I know we put that on the
16   back burner.
17   Q.   You had it on the back burner in 2007, so you didn't do
18   work on it in 2007?
19   A.   No.  We were -- we were focused on the ones we really
20   thought we had a shot with.
21   Q.   The question was asked you about the options and how many
22   options you have.
23        On the bottom of page 10, it lists options.  Is that what
24   you were referring to when you were talking about the options?
25   Looks like there's about seven or eight of them.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

53

```
1    A.    Yeah, I see those.  Yeah, that's correct.

2    Q.    And on that same page, just a little bit above that black

3    line above the options, there's a line for De Miracle.

4    A.    Yes.

5    Q.    And it's got 288,901 in that particular classification

6    there, and what was the year that those rights expired?

7    A.    2007.

8    Q.    2007, okay.

9          And the project Shadow Ball, which is down below, that's

10   182,500.  What was the year that those rights expired?

11   A.    2006.

12   Q.    But that project, in 2007, did it still have possible life

13   to it?

14   A.    Possible, but very little, as I recall.

15   Q.    Okay.  So in 2007, you determined that you weren't going

16   to take the extra work that needed to make sure that it could

17   go forward?

18   A.    That's correct.

19              MR. LYNCH:  Okay.  I don't have any further questions.

20              THE COURT:  Recross.

21              MR. GREENE:  Nothing further.

22              THE COURT:  Let me just ask you.  When you said it had

23   life, the option was up in 2006, but you may have renegotiated

24   in 2007?  You hadn't given up yet?

25              THE WITNESS:  Sometimes what we would do is, if we had
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

54

```
 1    a relationship with who had the rights, we would hope that they

 2    would bear with us and understand we had put money into the

 3    project and maybe respect that and give us a little more time,

 4    and in most cases people were very good about it.

 5              THE COURT:  Okay.  But the option was up in 2006, but

 6    you had a hope that you might continue in 2007?

 7              THE WITNESS:  Yes, sir, that's correct.

 8              THE COURT:  Okay.  Thank you very much.  You may step

 9    down.

10              THE WITNESS:  Thank you.

11              THE COURT:  Next witness.

12              MR. LYNCH:  At that point, we will rest our case.

13              THE COURT:  Okay.

14          Defense.

15          MR. GREENE:  We would submit the declaration of

16    Revenue officer Phillip Conrad, but other than that, we have

17    nothing further.

18              THE COURT:  Be received.  Okay.

19          (Exhibit received in evidence as indicated.)

20          MR. KEASTER:  Your Honor, we would like the

21    opportunity to cross-examine Mr. Conrad.

22              THE COURT:  Okay.

23              THE CLERK:  Right here to be sworn, please.  Please

24    raise your right hand.

25          Do you solemnly swear the testimony that you are about to
```

```
 1   give in the matter now before the Court shall be the truth, the
 2   whole truth, and nothing but truth, so help you God?
 3            THE WITNESS:  I do.
 4            THE CLERK:  Thank you.  You may be seated.
 5       May I please ask that you state your full name for the
 6   record and spell your last name.
 7            THE WITNESS:  Phillip C. Conrad, C-o-n-r-a-d.
 8            THE CLERK:  Thank you.
 9            THE COURT:  Okay.  You may inquire, Counsel.
10            MR. KEASTER:  Thank you, Your Honor.
11                 PHILLIP C. CONRAD, DEFENSE WITNESS,
12                        CROSS-EXAMINATION
13   BY MR. KEASTER:
14   Q.   Mr. Conrad, you've been with the IRS approximately 28
15   years; is that correct?
16   A.   Yes, that is correct.
17   Q.   And during that 28-year period, you've been involved in
18   cases where the IRS has lost taxpayers' documents, correct?
19            MR. GREENE:  Objection, speculation.
20            THE COURT:  Overruled.
21            THE WITNESS:  There have been --
22            THE COURT:  If you know.
23            THE WITNESS:  Within my recollection and experience,
24   there have been instances -- excuse me, I'm getting over a head
25   cold.  In my recollection and experience, there have been
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   incidents where I have been unable to secure records that at

 2   some point did exist but now, for an unknown reason, are no

 3   longer available to me.

 4            THE COURT:  Okay.  Thank you.

 5   BY MR. KEASTER:

 6   Q.   And in fact, that happened in this case, correct?

 7            MR. GREENE:  Objection.

 8            THE COURT:  Overruled.

 9        If you know.

10            THE WITNESS:  I do not know of any lost records in

11   this case.

12            MR. KEASTER:  Your Honor, may I approach?

13            THE COURT:  Yes.  Through the clerk, please.

14   BY MR. KEASTER:

15   Q.   Mr. Conrad, do you recognize the document that's been

16   given to you?

17   A.   Yes.  This was a response that I received from the service

18   center when I requested the original tax return for 2005 on

19   Mr. and Mrs. Baldwin.

20   Q.   Okay.  So just to set the scene here, the document that

21   we're looking at is a record request that you initiated in

22   order to obtain a copy of the plaintiffs' 2005 1040, correct?

23   A.   Yes, that is correct.

24   Q.   Okay.  And the box No. 5 in the upper right-hand corner,

25   it's listed as the document locator number, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, that is correct.
 2    Q.    And the document locator number is a number that persons
 3    within the IRS use to try and locate documents in a taxpayer's
 4    master file, correct?
 5    A.    Yes, that is correct.
 6    Q.    Okay.  The first two digits of that document locator
 7    number, the 08, refers to the IRS service center where that
 8    return was filed, correct?
 9    A.    That is correct.
10    Q.    Okay.  So we can tell from this Form 2275 that the
11    Baldwins filed their 2005 1040 return with the Andover,
12    Massachusetts, service center, correct?
13    A.    Best of my recollection, I cannot recall if 08, in that
14    time, represented Andover or not.
15    Q.    If that's what you put in your declaration that has been
16    filed in this case, would your recollection be refreshed?
17    A.    Yes.
18    Q.    Okay.  So if your declaration that was submitted in
19    evidence states that 08 -- the 08 reference was to Andover in
20    2005, your testimony would be that that would reflect the fact
21    that the Baldwins filed their 1040 individual return for 2005
22    in Andover?
23          MR. GREENE:  Objection, speculation.
24          THE COURT:  Overruled.
25          THE WITNESS:  That is correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. KEASTER:
 2    Q.   Now, in reviewing the Form 2275, it reflects that there
 3    are approximately 1390 pages missing from the Baldwins' master
 4    file, correct?
 5             THE COURT:  I'm sorry, Counsel, what are you referring
 6    to?
 7             MR. KEASTER:  Down under "reasons."
 8             THE COURT:  Is this Form 2275?
 9             MR. KEASTER:  Yes.  I'm sorry, Your Honor.
10             THE COURT:  Are you going to be marking that for
11    evidence?
12             MR. KEASTER:  It's being used for impeachment
13    purposes.
14             THE COURT:  But are you going to be marking it in
15    evidence?
16             MR. KEASTER:  Yes.  We'll mark it as the next exhibit
17    in order.
18             THE COURT:  Okay.  Just want to make sure it's going
19    to be considered.  Okay.
20         (Exhibit marked in evidence as indicated.)
21             THE COURT:  And can you state your question again?
22             MR. KEASTER:  Yes.
23    Q.   Mr. Conrad, does the Form 2275 reflect that there's
24    approximately 1390 pages missing from the Baldwins' master
25    file?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   To which section, Counselor, are you referring?

 2    Q.   It's about two-thirds of the way down.  There's a box, 17,

 3    that says "reason" -- I'm sorry, "federal records center

 4    action."

 5    A.   Mm-hmm.

 6    Q.   Box C is checked, documents not in file.  And then the box

 7    immediately next to that says "reason," and there's

 8    handwritten, "skips," and the reference is, the numbers that

 9    are skipped are 55510 to 56900.  And so that's a range of

10    documents that are no longer available in the Baldwins' master

11    file, and the document that you had requested, the 55708, fell

12    within that range.

13         THE COURT:  I'm sorry, Counsel, back up just a little

14    bit, because you've been testifying rather than asking the

15    question.

16         The question is, what does that reflect, the

17    handwritten -- information on that document?

18         THE WITNESS:  I do not know what that represents.  I

19    didn't make that annotation.  It was made by an employee at the

20    service center, and in the normal course of my business, I do

21    not question what that remark is.

22         THE COURT:  So you have no understanding or no

23    knowledge at all what those marks would be?  They mean nothing

24    to you?

25         THE WITNESS:  No.  It could be an internal annotation
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

60

1    by a clerk at a service center.

2              THE COURT:  Okay.  Go ahead.

3    BY MR. KEASTER:

4    Q.    Well, when you requested the original of the Baldwins'

5    2005 1040, did you get that original return back?

6    A.    No, I did not.

7    Q.    And what did you understand the reason why you could not

8    be provided with a copy of the Baldwins' 2005 1040 tax return?

9    A.    In the lower right-hand corner of Form 2275, it says that

10   the form had been destroyed.

11   Q.    Okay.  If the Baldwins had filed their 2005 1040X, which

12   is the amended claim for refund, with the Andover,

13   Massachusetts, service center, would the Andover,

14   Massachusetts, service center have processed that for filing?

15   A.    It would have depended on the year in which the amended

16   return was filed.

17   Q.    Okay.  If it was filed in June of 2011, would the Andover,

18   Massachusetts, service center have processed the 2005 1040X if

19   it had been received?  By the Baldwins.

20   A.    It was my understanding that in calendar year 2011,

21   amended returns received from persons residing in the state of

22   Massachusetts would have been processed through the service

23   center in Kansas City, Missouri.

24   Q.    So if the 2005 1040X amended return, pursuant to which the

25   Baldwins were seeking a refund claim of approximately $167,000,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   was in fact received by the Andover service center, it would

2   not have been processed at that service center, correct?

3   A.   That is correct.

4   Q.   That service center would have packaged that claim for

5   refund up with other documents and shipped it to the Kansas

6   City service center, correct?

7   A.   That is to the best of my understanding how that process

8   would have been carried out.

9   Q.   Okay.   And they would have done that without adding a

10  document locator number to that amended return, correct?

11  A.   That is correct.

12  Q.   The document locator number does not get added to a tax

13  return until it ends up at the -- what the IRS considered to be

14  the appropriate processing center for the return, correct?

15  A.   That is correct.

16  Q.   So if that return was in fact mailed in June of 2011 to

17  the Andover service center and received, and that return was

18  then mailed from Andover or otherwise delivered in some means

19  to the Kansas City service center and was lost in transit, the

20  IRS would have no record of ever receiving the Baldwins' 2005

21  1040X, correct?

22  A.   Based on my own experience with the transference of

23  records between offices, there is always a cover sheet that's

24  provided, a document transmittal, that's provided on any

25  documents, identifying them, their point of origin and their

1   point of destination.  It's a kind of packing slip, if you

2   will.  Again, speaking from my own experience, these

3   transmittal forms are only retained for one calendar year

4   following the year in which the documents are actually sent.

5       So let us say, for argument's sake, that I received

6   returns in the service center sometime this year, 2016, and I

7   had completed reviewing them and were going to return them to

8   the service center.  I would complete the document transmittal

9   form, identify the records I was returning to the service

10   center.  I would then retain a copy of my transmittal.  The

11   service center, upon receipt, would retain a copy of the

12   transmittal.  The transmittal is a three-page form.  They would

13   then send me a confirmation copy of the transmittal form back,

14   which I would then associate with my files.  I would then be

15   required for one calendar year to retain those records.  So

16   during the year 2017, if a question came up as to whether the

17   documents that were in my possession had been returned to the

18   service center, I could take a look at my transmittal binder

19   where I keep all of the forms and I could say, well, yes, on

20   such-and-such a date in 2016, I returned the records to the

21   service center and here's the confirmation copy of their

22   receipt.  But after 2017, I would not be required to retain

23   those records any further.  It's only one calendar year after

24   the year in which the records are transmitted.

25   Q.   So if the document, the 1040X for 2005, was received by

1    the Andover service center in 2011 and subsequently mailed or

2    otherwise transmitted to the Kansas City service center in

3    2011, any attempt to locate a transmittal letter in 2013 would

4    not have uncovered a transmittal letter, correct?

5    A.   That is true.

6    Q.   And so if the 2005 -- 1040X for 2005 was lost in transit

7    between the Andover service center and the Kansas City service

8    center, the IRS would have no record of ever receiving the

9    Baldwins' 1040X for 2005.

10             THE COURT:  After 2012.  After 2012.

11             MR. KEASTER:  After 2012.

12             THE WITNESS:  Yes, because the transmittal records are

13   only maintained for one calendar year following the year in

14   which the transmittal is generated.

15   BY MR. KEASTER:

16   Q.   And at what point in time did you conduct an investigation

17   to determine whether or not the IRS had any record of receiving

18   the Baldwins' 2005 1040X?

19   A.   Well, it would have been shortly after I'd received -- the

20   case had been assigned to me.  I think this data on my request

21   is 2015, when I put in the request for a copy of their original

22   2005 return.

23   Q.   So as of 2015, you would have had no way of determining

24   whether or not the Andover service center actually received the

25   Baldwins' 1040X in June of 2011, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    That is correct, based on the transmittal documents.

 2              MR. KEASTER:  No further questions, Your Honor.

 3              THE COURT:  Okay.  Redirect?

 4                      REDIRECT EXAMINATION

 5    BY MR. GREENE:

 6    Q.    If you'd take a look at the documents that plaintiff

 7    counsel had you review.  Do you have it in front of you, the

 8    Form 2275?

 9    A.    Yes.

10    Q.    Is it your testimony that the documents referred to, the

11    portion at the bottom, those documents were destroyed, not

12    lost?

13    A.    The annotation in the box shows that the document was

14    destroyed.

15              MR. GREENE:  Nothing further, Your Honor.

16              THE COURT:  Okay.  Anything further?

17              MR. KEASTER:  Nothing, Your Honor.

18              THE COURT:  Okay.  You may step down.

19              THE WITNESS:  Thank you.

20              THE COURT:  Okay.  Next witness.

21              MR. GREENE:  No more witnesses, Your Honor.

22              THE COURT:  No, I'm sorry.  We're back to you.  Next

23    witness.

24              MR. KEASTER:  We rested.

25              THE COURT:  You rested.  They rested.  You called him
```

65

```
 1    on rebuttal.  Excuse me, I'm sorry.  It was to you, and you
 2    asked his witness to be cross-examined.
 3              MR. KEASTER:  Yes.
 4              THE COURT:  Next witness.
 5              MR. GREENE:  No more witnesses, Your Honor.
 6              THE COURT:  Any witnesses or rebuttal?
 7              MR. KEASTER:  No, Your Honor.
 8              THE COURT:  Okay.  Counsel, I'm assuming both sides
 9    are prepared to argue the case?
10              MR. KEASTER:  Yes.
11              MR. GREENE:  Yes, Your Honor.
12              THE COURT:  Okay.  You can take your choice.  We're
13    going to either start the argument now, or if you'd like, we
14    can take a break and come back and -- we've been going for an
15    hour and a half here.  Would you like a break to prepare your
16    argument?
17         Why don't we come back at 1:30 and we'll argue the case at
18    1:30, okay?
19              MR. GREENE:  Yes, Your Honor.
20              THE COURT:  Is that okay, Counsel?  Let's do it.
21              MR. LYNCH:  Thank you.
22              THE COURT:  Okay.
23              THE CLERK:  All rise.
24         Court is in recess until 1:30.
25         (Recess held from 11:32 a.m. to 1:35 p.m.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

66

```
 1              THE COURT:  Okay.  Counsel, both sides have rested?

 2              MR. GREENE:  Yes, Your Honor.

 3              MR. LYNCH:  Yes, Your Honor.

 4              THE COURT:  Do you wish to be heard?  Argument?

 5              MR. LYNCH:  Please.  Thank you, Your Honor.

 6              THE COURT:  Mm-hmm.

 7              MR. LYNCH:  The evidence regarding timely filing is

 8   clear.  The Form 1040X was mailed on June 21st, 2011,

 9   approximately four months before the last date permitted by

10   statute to file this amended return.

11       We continue to believe that the IRS timely received the

12   Form 1040X in June of 2011 at their Andover, Massachusetts,

13   service center and forwarded it to the Kansas City service

14   center for processing, where the return was lost.

15       The government defense that the losses in this case were

16   not valid is just not correct.  The evidence that we submitted

17   proves that the Baldwins, through their movie company, had put

18   in place a professionally designed and accurate accounting

19   process to track all cash revenues and cash expenditures, that,

20   under this process, the costs to produce certain movies were

21   properly capitalized, and the deductions taken on the relevant

22   tax returns were proper because these movie projects became

23   worthless in 2007.

24       The evidence that we submitted proves that Howard Baldwin

25   had sufficient tax basis in his S corporation stock to allow
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

67

| | |
|---|---|
| 1 | him to take these deductions on the Baldwins' Form 1040 for |
| 2 | 2007, making the net operating loss that was carried back to |
| 3 | the 2005 tax year a valid deduction. |
| 4 | We submitted credible evidence that the Form 1040X was |
| 5 | timely filed.  The Nicholas Ruta declaration at paragraph 6 |
| 6 | establishes that he coordinated the preparation of the Form |
| 7 | 1040X with the Baldwins' accounting firm.  The Karen Baldwin |
| 8 | declaration at paragraph 4, and the Howard Baldwin declaration |
| 9 | at paragraph 5, establish that Howard and Karen Baldwin each |
| 10 | signed the Form 1040X on June 21st, 2011, after receiving it |
| 11 | from their accountants. |
| 12 | We have met our burden of proof under the common law |
| 13 | mailbox rule to show timely filing of the Form 1040X.  The |
| 14 | Howard declaration at paragraph 7 establishes that the Baldwins |
| 15 | gave Nicholas Ruta instructions to have the Form 1040X mailed |
| 16 | on June 21st, 2011.  The Nicholas Ruta declaration at paragraph |
| 17 | 8 proves that Nicholas Ruta instructed Ryan Wuerfel, another |
| 18 | employee of the Baldwin Entertainment Group, to post postage on |
| 19 | the pre-addressed mailing envelope, enclosed the Form 1040X, |
| 20 | and mailed the return at the Hartford Post Office on June 21st, |
| 21 | 2011.  The Ryan Wuerfel deposition, Exhibit 18, pages 13 |
| 22 | through 19, prove that the Form 1040X was properly mailed to |
| 23 | the IRS service center in Andover, Massachusetts, by Ryan |
| 24 | Wuerfel, with adequate postage attached. |
| 25 | The undisputed evidence in this case establish that the |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   IRS Form 1040X for 2005 was mailed on June 21st, 2011, with
 2   proper postage and addressed to the IRS service center in
 3   Andover, Massachusetts, where the Baldwins paid their 2005
 4   taxes, which were the subject of the claim for refund.
 5       The government submitted no evidence which is sufficient
 6   under the Ninth Circuit law to overcome the presumption of
 7   receipt that resulted from the application of the common law
 8   mailbox rule.  In fact, the government's only witness testified
 9   that the 2005 Form 1040 filed by the Baldwins was destroyed.
10       We submitted evidence regarding the amount of the 2007 net
11   operating loss.  The Nicholas Ruta declaration proves that the
12   Baldwins had in place a process with a professional bookkeeping
13   service to properly account for all cash receipts and cash
14   disbursements made by their movie company.  This process was
15   established by a reputable CPA firm to ensure that the
16   Baldwins' tax forms were accurately prepared.  The Nicholas
17   Ruta declaration, paragraph 9, establishes that the company's
18   accounting processes were designed to ensure that all bills
19   were timely paid, that the cash receipts and the cash
20   expenditures of the movie company were properly recorded in the
21   Quickbooks files for the company on a contemporaneous basis to
22   assure their accuracy, and that the bank statements were timely
23   reconciled to ensure that the books and records were accurate.
24   The Nicholas Ruta declaration, at paragraph 39, and Howard
25   declaration, at paragraph 21, establish that the movie projects
```

were tracked in the company's books and records on a
project-by-project basis.  Paragraph 39 of the Nicholas Ruta
declaration establishes that the movie company had capitalized
costs in excess of $4 million with respect to its movie
projects, which were set forth in the company's general ledger.
The government did not object to this evidence or offer any
evidence to contradict it.

Paragraph 40 of the Nicholas Ruta declaration establishes
that the movie company had capitalized costs in excess of
$4 million with respect to its movie projects, which were set
forth in the company's tax returns.  The government did not
object to this evidence or offer any evidence to contradict it.

The Nicholas Ruta declaration, at paragraph 50, and the
Howard Baldwin declaration, at paragraph 39, prove that the
Baldwins only needed approximately 1.29 million of
worthlessness deductions to permit the full amount of the
refund claimed on the Form 20 -- excuse me, Form 1040X,
although there were $4 million of such deductions.

The government knows that in the real world, every check
is not reviewed on an audit, and a taxpayer who demonstrates
that the books and records were kept in a professional manner
has provided sufficient records to support a deduction.  In any
event, under the Cohan rule, as set forth in *Olive vs.
Commissioner,* which was cited by the government in its
objections, the Court is permitted to use the evidence to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  estimate a reasonable basis in the intangible assets that were

2  written off in 2007.  We believe that there was sufficient

3  documentation to arrive at at least $2.9 million of basis to be

4  written off.

5      We presented evidence that proved that 2007 was the proper

6  year to take the loss deduction.  The Karen Baldwin

7  declaration, at paragraph 9, and the Howard Baldwin

8  declaration, at paragraphs 21 through 22, and Howard Baldwin's

9  testimony, prove that 2007 was the proper year to take the

10  losses attributable to worthless movie projects.

11      Under the seminal tax court case of *Echols vs.*

12  *Commissioner,* Fifth Circuit, 1991, the year that a worthless

13  intangible property loss is recognized for federal tax purposes

14  is the year that objectively the asset has no substantial

15  value, and subjectively the taxpayer has made a reasonable

16  determination that the asset is worthless to the taxpayer.

17      The Karen Baldwin declaration, at paragraph 9, and the

18  Howard Baldwin declaration, paragraphs 21 through 22, and

19  Howard Baldwin's testimony, establish that the legal rights to

20  the movie projects in question had expired in 2005, 2006 and

21  2007, making these rights have minimal value in 2007 unless the

22  Baldwins renegotiated these rights.

23      The Karen Baldwin declaration, at paragraph 9, and the

24  Howard Baldwin declaration, at paragraphs 21 through 22, along

25  with Howard Baldwin's testimony, also establish that the

1    Baldwins determined that the movie company was no longer going

2    to pursue making these movies in 2007, for financial and other

3    reasons, thus meeting the subjective test in *Echols* for taking

4    a worthless deduction in 2007.  Without further work, these

5    intangible property rights have no value.

6        We submitted evidence that established the tax basis in

7    Howard Baldwin's S organization stock.  The tax basis in this

8    stock is calculated by adding the cash contributions to the

9    corporation made by Howard Baldwin to the net income recorded

10   in the tax returns of the company, and subtracting from this

11   amount the net distributions made by the company to Howard

12   Baldwin and the net losses recorded in the tax returns of the

13   company.

14       Paragraphs 13 through 33 of the Nicholas Ruta declaration,

15   and paragraphs 23 through 37 of the Howard Baldwin declaration,

16   establish that Howard Baldwin had approximately 2.5 million of

17   tax basis in his S corporation stock, thus permitting the

18   deduction of the net operating loss that was carried back to

19   2005.  The government did not object to this evidence or offer

20   any evidence to contradict this.  Again, only 1.29 million of

21   basis was actually needed to get the refund in question.

22       Paragraph 50 of the Nicholas Ruta declaration, and

23   paragraph 39 of the Howard Baldwin declaration, establish that

24   Howard Baldwin only needed approximately 1.29 million of tax

25   basis in his stock to permit the full amount of the refund

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  claimed on the Form 1040X.  The government did not object to

2  this evidence or offer any evidence to contradict it.  The

3  record shows that there were much more than $1.29 million of

4  projects with rights that expired in 2007; approximately

5  $4 million worth.

6       Therefore, since the 1040X refund claim for 2005 was

7  timely filed and sought to utilize a 2007 loss which was proper

8  and for which Howard Baldwin had sufficient basis, plaintiffs

9  are entitled to a judgment in their favor in the amount of

10  $167,663, plus statutory interest.

11       Thank you.

12            THE COURT:  Thank you, Counsel.

13       Counsel.

14            MR. GREENE:  Thank you, Your Honor.

15       To resolve this case, the Court must answer two questions.

16  One, whether the Court has jurisdiction, and if so, two,

17  whether plaintiffs are entitled to the refund.

18       The Court does not have jurisdiction unless a claim for

19  refund was duly filed with the IRS in accordance with the

20  Internal Revenue Code and Treasury regulations.  A claim is

21  filed when it is received by the IRS, and "duly filed" means

22  that it was sent to the right place at the right time.

23       At best, plaintiffs' evidence shows that it was sent to

24  the wrong place.  And whether it was mailed or not, there is no

25  record that it was ever received until years after the statute

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   of limitations expired.

 2        If the claim for refund was mailed in 2011, it was sent to

 3   the wrong address.  We don't know for sure how the envelope was

 4   addressed, but the instructions from the accountant were to

 5   send it to the IRS in Andover, Massachusetts, even though the

 6   published 1040X instructions at the time directed that it be

 7   sent to the IRS in Kansas City, Missouri.

 8        The Ninth Circuit case of Quarty vs. United States held

 9   that the Internal Revenue Code provides that no suit for refund

10   may be maintained in any court until a claim for refund has

11   been filed with the Secretary of Treasury in accordance with

12   the Treasury regulations.

13        The Treasury regulations in effect at the time provided

14   that the claim for refund, with appropriate supporting

15   evidence, must be filed with the service center serving the

16   Internal Revenue district where the tax was paid.

17        When plaintiffs filed their 2005 tax return, they resided

18   in Massachusetts.  At the time, their tax return was sent to

19   the IRS in Andover, as it should.  In 2011, they still resided

20   in Massachusetts, but by that time, the IRS had changed its

21   operation so that the Internal Revenue service center in Kansas

22   City was serving the residents of Massachusetts, as reflected

23   in the 1040X instructions.

24        When the relevant Treasury regulation was changed in 2015,

25   the statement in the Federal Register was that the final
```

74

```
1    regulations clarify that unless otherwise directed, the proper
2    place to file the claim for credit or refund is with the
3    service center at which the taxpayer currently would be
4    required to file a tax return for the type of tax to which the
5    claim relates.
6         The 1040X instructions, consistent with the applicable
7    Treasury regulation, required plaintiffs to send their claim
8    for refund to the service center in Kansas City.
9         So even if plaintiffs mailed their 2011 claim for refund
10   to IRS, it was sent to the wrong place.  If plaintiff sent
11   their claim for refund to the wrong address, they did not
12   comply with the Treasury regulations and cannot meet their
13   burden to show that it was duly filed.
14        Furthermore, by using the wrong address, plaintiff should
15   not be entitled to rely on the common law mailbox rule and its
16   presumption that if it was mailed to the correct address, then
17   it was presumed to be delivered.  Without that, there is no
18   evidence that plaintiffs timely filed the claim for refund, and
19   the case must be dismissed for lack of jurisdiction.
20        Now, although the plaintiffs were required to send their
21   claim for refund to Kansas City, the real problem is that it
22   wasn't received by the IRS anywhere.  Even if plaintiffs had
23   sent their claim for refund to Andover, it should have been
24   stamped "received" by IRS and forwarded on to the correct
25   service center for further processing.  There's simply no
```

1    evidence in the record that the IRS received a timely 2005

2    claim for refund from plaintiffs.

3        Plaintiffs' only witness to the mailing didn't address the

4    envelope and doesn't know exactly what he allegedly mails.

5    What he surely knows is that plaintiffs, whom he thinks of as

6    family, are relying on him and stand to lose considerable

7    amount of money without his testimony.

8        Plaintiffs, who have a history of filing their tax returns

9    nearly two years late, claim that they gave their claim for

10   refund to their assistant.  Their assistant claims that he knew

11   it was a, quote, sensitive tax document, but he didn't bother

12   to stand in line and spend the four dollars to send it by

13   certified or registered mail, and he didn't bother to give it

14   directly to someone at the post office, and instead just placed

15   it in an outgoing box.  Plaintiffs then promptly forgot about

16   it.  They forgot about getting a check for $167,000 from the

17   government.  Under their time line, they had almost four months

18   where the lack of any response from the IRS could have prompted

19   them to follow up before the statute of limitations expired,

20   but they did nothing, and continued to do nothing to check on

21   their claim until nearly two years later.

22       The circumstantial evidence of plaintiffs' late-filed

23   returns for tax years 2008, '9, '10 and '11 is sufficient for

24   the Court to find that the claim for refund was untimely filed.

25       Now, we will never know exactly what happened, but certain

1    explanations are more likely than others.  And plaintiffs'

2    theory requires that something very special happen.  It

3    requires the Court to believe that the claim for refund was

4    received by the IRS and then lost before it was assigned a

5    document locator number.

6         If the claim for refund was lost by the post office

7    en route to the IRS, it was never filed with the IRS, and the

8    Court would have no jurisdiction.  If it was lost by the IRS

9    after it was assigned a document locator number, it would

10   appear on the IRS transcripts, and there would be no dispute

11   that the claim had been timely filed.

12        Now, plaintiffs' explanation is possible, but unlikely,

13   and the question is whether their unlikely scenario is more

14   likely than the other possible explanations.  Maybe plaintiff

15   sent some other sensitive tax document in 2011 that was not the

16   1040X for tax year 2005.  Maybe the envelope was not properly

17   addressed or didn't have adequate postage and never got to the

18   IRS.  Maybe something happened to the envelope after it was

19   placed in the outgoing box at the post office, and maybe the

20   claim for refund was lost by the post office before it was

21   delivered to the IRS.

22        There are a lot of ways to explain why the claim for

23   refund never got to the IRS.  Plaintiffs assume that risk by

24   not using certified or registered mail, and if the claim for

25   refund never got to the IRS, it was never filed, and the Court

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    has no jurisdiction to award plaintiffs a refund.

2        Now, with regards to the second question, the Court must

3    determine whether or not plaintiffs have adequately

4    substantiated the losses for their claimed deduction.

5        Assuming, for the sake of argument, that the 2005 claim

6    for refund was timely filed, plaintiffs still have the burden

7    to prove the amount of the refund to which they are entitled to

8    recover.   In this case, that means they have the burden to

9    substantiate the amount of the loss and the timing of the loss

10   from Baldwin Entertainment Group.

11       The parties agree that plaintiffs need to substantiate

12   losses of approximately 1.3 million to be entitled to their

13   claim for refund of 167,000.   Plaintiffs set forth losses from

14   five projects to support their claimed refund:   Mandrake,

15   Phantom, De Miracle, Indiscretion, and Shadow Ball.   Combined,

16   these projects claim expenses totaling over $3 million;

17   however, very little of that total survives critical analysis.

18       An income tax deduction is a matter of legislative grace,

19   not a right, and plaintiffs have the burden of clearly showing

20   that right to the claimed deduction.   To show that they were

21   entitled to the claimed deductions, plaintiffs were required by

22   the Treasury regulation to maintain sufficient records to

23   substantiate all deductions on their tax return.

24       Plaintiffs have not submitted into evidence the underlying

25   documents to support the claimed losses.   No contracts, no

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    invoices, no cancelled checks.  The contracts, invoices and

2    cancelled checks are the supporting documents for the losses

3    reported on the 2007 corporate 1120S that flowed through to

4    plaintiffs' personal 1040, both of which were filed in

5    September of 2010.  They should have had the documents then.

6    They should have held on to them while they were waiting for a

7    refund, and they should have made extra sure that they were

8    available when their claim was denied less than three years

9    later in August of 2013.

10       Plaintiffs bear the blame and the consequences of not

11   maintaining and producing these critical documents.  With the

12   hundreds of thousands of dollars on the line, the only

13   documents plaintiffs have produced were summary documents: tax

14   returns, Quickbooks printouts, and bank statements for one

15   year, with check numbers and amounts, but no additional

16   information.

17       The record leaves us wondering what information was on the

18   original source documents and whether the right amounts were

19   recorded in the proper categories.  Without these documents, we

20   cannot adequately challenge or verify the amounts claimed as

21   losses.

22       To bridge this yawning gap between the evidence provided

23   and the losses that were claimed, plaintiffs ask the Court to

24   trust the accounting system and extrapolate from a few examples

25   to support millions of dollars of claimed losses.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Mr. Baldwin's testimony provides no detail regarding the

2    individual expenses, but suggests that he can remember the

3    total capitalized cost, by project, down to the penny.

4    Mr. Ruta didn't make the payments, but he explains how

5    several payments were recorded in 2007.

6    The Court, as fact-finder, is asked to trust the

7    accounting system that was put into place and carried out by

8    others.

9    Now, even if this testimony is accepted, it's not

10   sufficient.  Recording transactions on QuickBooks and then

11   reconciling them to bank statements ensures that all the

12   payments were accounted for, but it doesn't necessarily ensure

13   that the payments were properly classified or that the expenses

14   were necessarily taken in the appropriate period.

15   Plaintiffs rely heavily on the Cohan rule, which provides

16   that if a taxpayer establishes that an expense is deductible

17   but is unable to substantiate the precise amount, the Court may

18   estimate that amount, bearing heavily against the taxpayer,

19   whose inexactitude is of his own making.

20   If the Court chooses to indulge plaintiffs, it must have a

21   reasonable evidentiary basis to conclude that a deductible

22   expense was incurred in at least the amount to be allowed.  The

23   Court should be particularly skeptical of claimed but

24   unsubstantiated deductions where the taxpayer could have and

25   should have maintained the necessary records.  If the losses

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   were legitimate, plaintiff should have maintained the records,

2   and the Court should be skeptical of the self-serving testimony

3   without such records.

4        In addition to having the burden to establish the amount

5   of the expenses, plaintiffs must establish that tax year 2007

6   and not some other year was the appropriate year to take the

7   loss.

8        Revenue Ruling 2004-58 sets forth the rules for losses

9   related to acquiring and developing creative property.  Losses

10  are allowed if the asset is abandoned or worthless.

11       Abandonment requires both an intention to abandon the

12  asset and an affirmative act of abandonment.  The event must be

13  observable to outsiders and constitute some step which

14  irrevocably cuts ties with the asset.  Mere non-use of an asset

15  or an internal decision is not sufficient.

16       Worthlessness requires a closed and completed transaction

17  fixed by identifiable events establishing that the property is

18  worthless in the tax year which the deduction is claimed.

19       A taxpayer's treatment of the cost of acquiring property

20  for financial accounting purposes does not control the

21  treatment of those costs for federal income tax purposes.

22       Plaintiffs' approach for claiming losses was inconsistent

23  with the Revenue ruling.  They organized expenses by project,

24  and then instead of taking losses when the contracts expired,

25  which would have met the requirement of an identifiable event

establishing that the property was worthless, they took the
losses when they gave up.  Sometimes this corresponded with
when the contract expired, and sometimes this was when they
gave up trying to negotiate a new contract.  To take the loss,
the option needed to be objectively worthless as explained by
the Revenue ruling, and the expenses needed to be properly
substantiated.

Of the five projects described in the declaration of
Howard Baldwin, only the option contracts for Mandrake and
De Miracle expired in 2007.  The other three expired in 2006.
In trying to explain how the expenses were capitalized,
Nicholas Ruta provided examples from Mandrake and Shadow Ball,
of which only 127,500 is arguably supported by the bank
statements and deductible in 2007.

First, Mandrake.  Mr. Ruta explains that $50,000 was paid
on March 29, 2007, with check No. 11567, for a third option
extension.  According to Mr. Baldwin, the contract expired by
its terms in 2007 and was written off.  Even if all that is
accepted, only $50,000 has been substantiated.

The second example they provide is Shadow Ball.
Mr. Baldwin's testimony is that the financial records show that
the option expired in 2006, but that $452,000 was claimed as a
loss in 2007.  Mr. Ruta's testimony is that payments totaling
77,500 were made during 2007.  The individual payments by check
number were agreed to the bank statements in evidence.  The

1   reason for payment and the project classification were provided

2   by testimony.

3        Plaintiffs' examples, if accepted by the Court, would only

4   substantiate 77,500 as an abandonment loss in 2007.  The

5   remainder was worthless in 2006, not 2007, and should have been

6   taken in that year.  This brings the total, if accepted by the

7   Court, to $127,500 in losses.  These figures are not supported

8   by contracts, invoices, or cancelled checks, but they are at

9   least consistent with the bank statements supported by

10  testimony.  Allowing this loss and disallowing the remainder

11  would at least be consistent with Cohan, especially since

12  plaintiffs could have and should have maintained the necessary

13  records for the remaining expenses, and the failure to disclose

14  the documents is a problem of plaintiffs' own making.  To be

15  clear, this is a deduction of 127,500, which is approximately

16  10 percent of the amount necessary to support the full claimed

17  refund.

18       Based on the evidence provided, the claim for refund

19  should be denied because a timely claim for refund was never

20  filed.  Even under plaintiffs' theory, the claim for refund was

21  sent to the wrong place, and the IRS has no record that it was

22  ever received.

23       If the Court finds that a timely claim for refund was

24  filed and accepts -- plaintiffs have the burden to substantiate

25  their claimed expenses.  The plaintiffs have not presented

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   source documents to support these claimed expenses, but have

 2   provided summary documentation and testimony, which, if

 3   accepted by the Court, would support a loss of 127,500.  The

 4   Cohan rule allows the Court to accept this loss, but not the

 5   $1.3 million necessary for the full claimed refund, and the

 6   Court should limit the claimed refund accordingly.

 7           THE COURT:  Thank you.

 8       Anything further?  Either side?

 9           MR. LYNCH:  Yes, Your Honor.

10       The government tries to make it look like the Baldwins

11   filed in the wrong location, Andover, Massachusetts, instead of

12   in Kansas City, Missouri.  Or maybe it was Kansas City, Kansas.

13   Can't remember which one it is now.

14       The regulations changed in 2015.  They were confusing.

15   There were statements in the instructions for the Form 1040X

16   that didn't make the regulations.  The regulations in 2011

17   specifically said that the claim, with appropriate supporting

18   evidence, must be filed with the service center serving the

19   Internal Revenue district in which the tax was paid.  The tax

20   was paid to the service center in Andover, Massachusetts.  That

21   service center still served taxpayers in that district, it just

22   didn't process Forms 1040 filed after 2010.  But the

23   regulations were clear, that you file the refund claim in the

24   same center that you paid the tax.

25       The government makes an argument that I personally have
```

84

1   trouble following, that serving the Internal Revenue district

2   means something different than it's in that location, it's

3   still there, and it's where the tax was paid.

4        In any event, the Treasury decision in which the

5   regulations were changed talk about the reason for the change.

6   They wanted to clarify it.  So that, after 2015, you needed to

7   file in the service center where you currently filed your

8   returns, not where you paid the tax.  But 2011, the Baldwins

9   followed the rules as they existed at that point in time.

10        The questions about evidence, we think we've provided very

11   good evidence.  It was independently prepared.  Evidence of

12   basis.  It was done in a professional manner.  There was no

13   incentive on the part of the people who kept these books and

14   records to do anything wrong.  Their incentive was to do it

15   properly, which they did on that side of it.

16        I think the government misstates the Cohan rule.  The

17   Cohan rule doesn't say that you don't get any deduction.  It

18   says that a reasonable estimate will be made based on the

19   records that are there.  In fact, the *Olive* case that the

20   government cites is a perfect example of it.  The taxpayer had

21   no contemporaneous records, and the tax court ruled that the

22   taxpayer could get costs of its sole deduction in the millions

23   of dollars based on the Cohan rule.  So I think the government

24   has misstated that.

25        In any event, I believe that we have presented sufficient

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

85

1    evidence to document at least 1.29 million of basis that was

2    written off in 2007.

3        The last thing, this idea that the Revenue ruling that the

4    government cites is the law, is just not correct.  The

5    government knows that Revenue rulings are not the law.  They're

6    just the Service's interpretation of how they would rule in a

7    certain position.  And the law is made by the courts.  And the

8    *Echols* case is clear that you don't have to take the deduction

9    absolutely in the year that the rights expired.  You're allowed

10   to do as the Baldwins did, and try to continue to keep these

11   rights alive, even though technically the legal rights had

12   expired.  But in real life, things stay alive as long as you

13   keep negotiating and you keep working your contacts.  And

14   that's what happened.  It wasn't until 2007, when the ultimate

15   decision to close the company was made, that the Baldwins

16   determined that these assets were worthless, which they were

17   worthless when they stopped working on them in 2007.

18       Thank you.

19           THE COURT:  Okay.  Thank you, Counsel.

20       Anything further?

21       Okay.  In this particular matter, the Court at this time

22   is going to take this matter under submission.  We'll get the

23   decision out to you probably about within a week.  Okay?

24       Thank you, Counsel.

25           MR. GREENE:  Thank you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

86

1              MR. LYNCH:  Thank you, Your Honor.

2              THE CLERK:  All rise.

3         Court is adjourned.

4

5         *(Proceedings concluded at 2:05 p.m.)*

6

7                   *--o0o--*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

87

```
 1                         CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753, Title 28,

 4  United States Code, the foregoing is a true and correct

 5  transcript of the stenographically reported proceedings held in

 6  the above-entitled matter and that the transcript page format

 7  is in conformance with the regulations of the

 8  Judicial Conference of the United States.

 9

10  Date:  JANUARY 27, 2017

11

12

13

14                           /S/ SANDRA MACNEIL

15                        Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA